FILED
United States Court of Appeals
Tenth Circuit

June 7, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ESTEBAN CORNELIO-LEGARDA,

Defendant - Appellant.

No. 08-8067

(D. Wyoming)

(D.C. No. 2:07-CR-00239-WFD-1)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.

I.      **Introduction**

Defendant-appellant, Esteban Cornelio-Legarda, was charged in a multi-count indictment with drug, conspiracy, and firearm crimes.  The district court acquitted Cornelio-Legarda of one count and the jury found him guilty of ten remaining counts.  In this appeal, he raises five challenges to his convictions and one challenge to his sentence.  Specifically, he argues (1) the evidence was

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

insufficient to sustain the two international money laundering convictions; (2) the district court erred by not severing the felon-in-possession charge; (3) the evidence was insufficient to support the two weapons charges; (4) the district court erroneously refused to grant a mistrial when a prejudicial demonstrative exhibit was shown to the jury; (5) hearsay statements were erroneously admitted; and (6) the Government failed to disclose exculpatory information. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we **affirm** the judgment and sentence.

## II. Background

On September 19, 2007, Cornelio-Legarda was charged in a multi-count indictment with conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841 and 846 ("Count 1"); conspiracy to launder money internationally, in violation of 18 U.S.C. § 1956(a)(2) ("Count 2"); distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) ("Count 4"); possession of a firearm in furtherance of a drug felony, in violation of 18 U.S.C. § 924(c)(1)(A) ("Count 8"); being an unlawful drug user in possession of a firearm and aiding and abetting, in violation of 18 U.S.C. § 922(g)(3) and § 924(a)(2) ("Count 9"); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2) ("Count 10"); use of a communication facility to facilitate a drug felony, in violation of 21 U.S.C. § 843(b) ("Count 14," "Count 15," and "Count 17"); international laundering of

monetary instruments and aiding and abetting, in violation of 18 U.S.C.

§ 1956(a)(2) ("Count 18"); and distribution of methamphetamine, in violation of

21 U.S.C. § 841(a)(1) and (b)(1)(C) ("Count 24"). On the day Cornelio-

Legarda's trial commenced, the district court held a *James* hearing to determine

whether statements made by Cornelio-Legarda's coconspirators were admissible

under Fed. R. Evid. 801(d)(2)(E). *See United States v. James*, 590 F.2d 575, 579-

80 (5th Cir. 1979). At the hearing, DEA Special Agent Steve Woodson testified

that several individuals were arrested as a result of wiretaps conducted in

Riverton, Wyoming from 2004 to 2005. When interviewed, those individuals

implicated Cornelio-Legarda in a drug distribution conspiracy. The DEA sought

and received court authorization to wiretap Cornelio-Legarda's phone. At the

close of the investigation, forty individuals, including Cornelio-Legarda and his

codefendant Karen Allen, were indicted for distributing methamphetamine in

Wyoming. During the *James* hearing, Agent Woodson specifically named each of

the forty individuals.

The district court reserved ruling on whether the requirements of Rule

801(d)(2)(E) had been satisfied, choosing instead to first hear from additional

witnesses outside the presence of the jury. After the testimony of Jessica Myhre,

the court concluded the Government had shown by a preponderance of the

evidence that a conspiracy existed and Cornelio-Legarda participated in it. *See*

*United States v. Williamson*, 53 F.3d 1500, 1517-18 (10th Cir. 1995) ("In order

for statements to be admissible under Rule 801(d)(2)(E), the proponent of the evidence must establish . . . that: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of, and in furtherance of, the conspiracy." (citations omitted)).  The district court further stated, however, that it would look "with great caution" on the testimony of certain declarants but would "conditionally allow the testimony to go forward."

The Government's first trial witness, Jessica Myhre, testified she met Cornelio-Legarda in January 2007 and began selling drugs with him approximately two weeks later.  According to Myhre, she and Cornelio-Legarda made several trips to Rock Springs, Wyoming to obtain drugs from Cornelio-Legarda's source.  She described her role in the conspiracy as collecting money from people who wanted to obtain methamphetamine.  Cornelio-Legarda would then arrange to obtain the methamphetamine.  Once obtained, Myhre would sell some of the drugs to people she knew and Cornelio-Legarda would sell some to people he knew.  Myhre also testified about wire transfers she made to Garrick Murdock, an individual who fronted methamphetamine to her and Cornelio-Legarda.  Specifically, she testified she wired money to Murdock via Western Union in February 2007.  Myhre and Cornelio-Legarda collected the money by selling drugs to individuals in the Riverton, Wyoming area and thereafter sent it to Murdock as payment for methamphetamine.

During Myhre's testimony, the Government showed her an organizational chart containing photographs of individuals allegedly involved in the conspiracy. When the Government sought to have the chart admitted as an exhibit, Cornelio-Legarda's codefendant objected. Cornelio-Legarda objected to permitting the jury to use the chart during deliberations, but suggested using it for demonstrative purposes. The district court refused to receive the chart as an exhibit, concluding it was a "comment on the evidence" because it depicted a hierarchy that was the Government's burden to prove. Consistent with Cornelio-Legarda's suggestion, however, the court permitted the chart to be shown to the jury during Myhre's testimony for the "purpose[] of assisting the jury and identifying" the individuals involved in the conspiracy. The court then gave the jury the following cautionary instruction:

> Ladies and gentlemen, the fact that this document, for example, identifies certain individuals at the top of it as sources has not been—whether it has been proved by the evidence will be for you to decide. The fact that the government's exhibit identifies them as sources doesn't make it so. It is only so if you find that the government has met its burden of proof on that matter.

Both the Government and Cornelio-Legarda used the chart while examining and cross-examining Myhre. On the second day of trial, however, the district court *sua sponte* raised additional concerns about the chart. Specifically, the court suggested the photo of Cornelio-Legarda used in the chart made him look "sinister" and questioned why his was the only name denoted in red. The court

-5-

asked the parties to submit proposed language for a cautionary instruction to the jury. Rather than submit such language, Cornelio-Legarda moved for a mistrial, arguing no limiting language could cure the prejudice created by the chart. The district court denied the motion for a mistrial but ruled the chart could not be shown to the jury again unless it was revised. The court then instructed the jury as follows:

> I've directed that the United States change their chart. . . .
>
> . . . .
>
> First of all, you may recall that the picture of Mr. Cornelio-Legarda had a caption—a block caption that was larger and in red; that the names of Jessica Myhre, Oliva Weeks and Ashley Butner were on the same row as he with their full names; that the individuals in the next two rows had their first initial and then their last name and in smaller pictures. There are arrows. There's an item entitled "sources" at the very top, and at the very bottom of the last pictures there's the word "customers."
>
> All of that, in my view, is a comment on the evidence. Now, I'm going to allow the United States great liberty to do just that in closing argument. That's where that kind of comment is appropriate; and if there's evidence—if the government believes there is evidence to support that based on what they've presented here, they'll have a right to do so.
>
> There was also a scale of justice that you may have noticed superimposed on the piece of paper. The scale is tipping in one direction. In a metaphorical sense there's a scale of justice in this room right now, and you and you alone will tip it, no one else, not me nor anyone else in this room. You will decide whether the burden of proof to which I just made reference has been proved or not proved as to each and every count contained in the indictment.
>
> Whether or not some or all of the individuals identified in this photo array . . . are part of a conspiracy as charged in Count One and as may be charged as participants in other counts contained in the indictment will be left for you to decide based on your assessment of the evidence.

And I instruct you not to take into account the captions that appeared on that demonstrative evidence, that Exhibit 2000. Who the sources are, if any; who the customers are, if any; who the participants of this conspiracy are, if any; is for you and you alone to decide based on all the evidence received in this matter.

After delivering the instruction, the district court asked Cornelio-Legarda if he had any objection to it and Cornelio-Legarda said no. The demonstrative chart was not used by either the Government or Cornelio-Legarda during the remainder of the trial.

The Government next presented the testimony of Stephanie Miller, Garrick Murdock's girlfriend. Miller testified she and Murdock frequently traveled from Utah to Riverton, Wyoming to buy and sell methamphetamine. Some time after 2006, Cornelio-Legarda became one of Miller's drug sources. Miller described an incident in February 2007 when she and Murdock provided four or five thousand dollars to obtain methamphetamine from a supplier in Salt Lake City. Cornelio-Legarda took a share of the drugs and paid for it by having Myhre wire money to Murdock. Miller testified there were other domestic wire transfers relating to the purchase and sale of methamphetamine between herself and Cornelio-Legarda.

Miller also testified about $500 she and Murdock wired to an individual in Mexico. On June 2, 2007, Cornelio-Legarda told Murdock in a wiretapped telephone conversation that he needed "to send five hundred to Mexico." Murdock agreed to raise the money. Later that day, Miller called Cornelio-Legarda and told him she had the money but needed the address in Mexico to

which it should be sent. Cornelio-Legarda provided her with that information and the money was eventually wired to Mexico by Miller and Murdock. Miller testified she hoped to receive methamphetamine in exchange for the $500. However, the recipient in Mexico did not claim the money; Murdock and Miller retrieved it from Western Union approximately a week later.

Olivia Weeks, Cornelio-Legarda's sister, also testified as a witness for the Government. Weeks began selling methamphetamine with Cornelio-Legarda in 2007 when he was living at her house. Weeks described an April 2007 incident during which Cornelio-Legarda threatened her ex-boyfriend with a shotgun. Cornelio-Legarda then placed the shotgun in Weeks's car, retrieved it after two or three days, and placed it back in Weeks's car several hours later. The shotgun was seized by police on April 27, 2007.

Agent Woodson was the Government's last witness. He described how the DEA wiretapped five telephones, including Cornelio-Legarda's phone, from January 2007 to July 2007. Woodson testified he prepared transcripts of all the recorded calls. The transcripts had been previously entered into evidence through the testimony of the Government's witnesses. A chart prepared by Woodson that summarized the intercepted calls was received for demonstrative purposes.

At the conclusion of all the evidence, the court acquitted Cornelio-Legarda of Count 8 and the jury found him guilty of the remaining offenses charged in the indictment. He was sentenced to life imprisonment as to Count 1; 360 months'

imprisonment as to Counts 4 and 24; 240 months' imprisonment as to Counts 2, 9, 10, and 18; and 48 months' imprisonment as to Counts 14, 15, and 17. In this appeal, he raises five challenges to his convictions and one to his sentence arguing: (1) the evidence was insufficient to sustain the two international money laundering convictions; (2) the district court erred by not severing the felon-in-possession charge; (3) the evidence was insufficient to support the two weapons charges; (4) the district court erroneously refused to grant a mistrial when a prejudicial demonstrative exhibit was shown to the jury; (5) hearsay statements that did not meet the requirements of Fed. R. Evid. 802(d)(2)(E) were erroneously admitted; and (6) the Government failed to disclose exculpatory information contained in presentence reports prepared for his coconspirators.

## III.  Discussion

### A.  *International Money Laundering Charges*

Cornelio-Legarda was charged in Count 2 with conspiring to commit international money laundering, in violation of 18 U.S.C. §§ 1956(a)(2) and 1956(h); and in Count 18 with aiding and abetting the same, in violation of 18 U.S.C. § 2.  He argues there was insufficient evidence to convict him of either count.  This court reviews Cornelio-Legarda's sufficiency of the evidence claim de novo, examining the evidence in the light most favorable to the Government. *United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010).

Cornelio-Legarda argues the Government must plead and prove the funds involved in the charged transaction represented proceeds from unlawful activity. He asserts the Government failed to introduce any evidence showing the $500 Murdock wired to Mexico in June 2007 represented the proceeds of illegal drug trafficking. Cornelio-Legarda's argument is flawed because he relies on elements from a statute different from the one he was charged with violating. In *United States v. Rahseparian*, this court set out the elements of 18 U.S.C. § 1956(a)(1)(B)(i), one of which is that "the property involved was in fact the proceeds of unlawful activity." 231 F.3d 1257, 1264 (10th Cir. 2000); *see also United States v. Garcia-Emanuel*, 14 F.3d 1469, 1473 (10th Cir. 1994). Cornelio-Legarda, however, was not charged with violating § 1956(a)(1); he was charged with violating § 1956(a)(2), the international money laundering statute. The Government could obtain a conviction on the international money laundering charges by proving Cornelio-Legarda transferred or attempted to transfer funds from the United States to a place outside of the United States *either* (1) with the intent to promote the carrying on of specified unlawful activity, *or* (2) knowing the funds represented the proceeds of unlawful activity and knowing the transfer was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity or to avoid a state or federal reporting requirement. 18 U.S.C. § 1956(a)(2); *Cuellar v. United States*, 128 S. Ct. 1994, 1999 (2008) ("[18 U.S.C. § 1956(a)(1)] makes it unlawful to engage in certain

-10-

financial transactions, while [18 U.S.C. § 1956(a)(2)] criminalizes certain kinds of transportation.").

Because the operative statute is written in the disjunctive, the Government was not required to prove that Cornelio-Legarda knew the funds transferred to Mexico represented the proceeds of unlawful activity. As relevant to the issue raised on appeal, to meet its burden on Count 2 and Count 18, the Government was required only to show Cornelio-Legarda transferred funds from the United States to Mexico "with the intent to promote the carrying on of specified unlawful activity" or he aided and abetted the same. *Id.* Cornelio-Legarda makes no argument that the Government failed to present such evidence. In fact, he readily admits in his appellate brief the Government's evidence at trial showed that Murdock wired $500 to Mexico and that Miller testified the purpose of the wire transfer was to obtain methamphetamine. Miller testified Cornelio-Legarda asked her to send the $500 to Mexico and this testimony was corroborated by the transcript of the recorded telephone conversations between Cornelio-Legarda, Miller, and Murdock. This evidence was more than sufficient to support the jury's verdict as to Count 2 and Count 18.

### B. Firearm Charges

Three of the counts against Cornelio-Legarda involved firearms. Count 8 charged him with possessing a firearm in furtherance of a drug trafficking crime, Count 9 charged him with being an unlawful drug user in possession of a firearm,

and Count 10 charged him with being a felon in possession of a firearm. The district court acquitted him of Count 8. Cornelio-Legarda makes two arguments relating to the two remaining firearm charges. He challenges the refusal of the district court to sever the felon-in-possession charge from the remaining counts in the indictment and he asserts there was insufficient evidence to sustain either Count 9 or Count 10.

A district court's decision on a motion to sever is reviewed for abuse of discretion. *United States v. Durham*, 139 F.3d 1325, 1333 (10th Cir. 1998). Rule 14 of the Federal Rules of Criminal Procedure permits a district court to sever counts if joinder of offenses in an indictment "appears to prejudice" the defendant. To prevail under the applicable appellate standard of review, however, Cornelio-Legarda "must show actual prejudice resulted from the denial." *United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008) (quotation omitted). Cornelio-Legarda asserts the district court's refusal to sever the felon-in-possession charge prejudiced him because prosecuting that count with the other charges permitted the jury to hear otherwise inadmissible evidence that (1) he had been in prison, (2) he had been arrested, and (3) he had a prior felony conviction. These arguments all lack merit.

While it is true Miller testified Cornelio-Legarda had been in prison, that testimony was given spontaneously at the beginning of Miller's direct examination when she was describing how she met Cornelio-Legarda. Cornelio-

Legarda has not shown how Miller's testimony was related in any way to Count 10. Thus, he has failed to show actual prejudice flowing from the refusal to sever.

Cornelio-Legarda also argues the Government's evidence relating to Count 10 involved testimony that he was arrested for possessing a 12-gauge shotgun on April 27, 2007, and evidence relating to a domestic dispute at Weeks's home on that date. He asserts this "criminal propensity evidence" prejudiced the jury against him. First, a review of the record reveals there was no testimony Cornelio-Legarda was arrested on April 27, 2007. Officer Victor Matoon testified a 12-gauge pump shotgun was seized from a bedroom occupied by Cornelio-Legarda but he did not testify that Cornelio-Legarda was arrested. Further, Cornelio-Legarda has again failed to show that the testimony relating to the domestic dispute on April 27, 2007, was relevant only to Count 10. Evidence that a firearm was seized from Cornelio-Legarda's bedroom on April 27, 2007, was clearly relevant to Count 9, which charged Cornelio-Legarda with being an unlawful drug user in possession of a 12-gauge shotgun. Because the evidence Cornelio-Legarda references was either not presented or would have been admissible even if Count 10 had been severed, he has failed to show prejudice.

Finally, Cornelio-Legarda correctly asserts the refusal to sever Count 10 resulted in the jury being told he had previously been convicted of a felony. The prior felony was stipulated to by Cornelio-Legarda and the stipulation was read

-13-

into the record at the close of the Government's case. The details of the prior conviction were not provided to the jury. The conviction was mentioned only briefly by the Government[1] during its closing argument on the felon-in-possession charge when the prosecutor simply stated: "Mr. Cornelio has stipulated that he is a convicted felon." On these facts, we cannot conclude Cornelio-Legarda has met his heavy burden of showing actual prejudice.[2] *See United States v. Valentine*, 706 F.2d 282, 290 (10th Cir. 1983) (holding the refusal to sever firearm charges was not an abuse of discretion because the defendant's prior conviction was mentioned only briefly during closing argument and "limited to establishing the fact of the conviction as an element of the weapons offenses").

Cornelio-Legarda also argues the evidence was insufficient to sustain his convictions on Count 9 and Count 10. We review this claim de novo, but consider the evidence in the light most favorable to the Government. *Cardinas Garcia*, 596 F.3d at 794. To obtain a conviction on Count 9, the Government was required to prove (1) Cornelio-Legarda was an unlawful user of a controlled

---

[1]Cornelio-Legarda's counsel also mentioned the conviction during his closing argument, stating: "Now, I entered into a stipulation that Mr. Cornelio-Legarda has been previously convicted of a felony. I didn't have to do it. Nothing made me sign that piece of paper. I did it because I'm not trying to hide that fact. It's part of his life. It's part of his past. I can't fix it. He can't fix it."

[2]Cornelio-Legarda did not request a limiting instruction, none was given, and he makes no appellate argument that this was plain error. *United States v. Valentine*, 706 F.2d 282, 290 n.7 (10th Cir. 1983) (holding that a limiting instruction "safeguard[s] the accused from the possibility that the jury might view a prior conviction as evidence of predisposition to commit the crimes charged").

substance, (2) he knowingly possessed a firearm, and (3) such possession of the firearm was in or affecting interstate commerce. 18 U.S.C. § 922(g)(3). To obtain the Count 10 conviction, the Government's burden was to prove (1) Cornelio-Legarda was previously convicted of a crime punishable by imprisonment exceeding one year, (2) he thereafter knowingly possessed a firearm, and (3) the possession was in or affecting interstate commerce. 18 U.S.C. § 922(g)(1); *United States v. Hishaw*, 235 F.3d 565, 571 (10th Cir. 2000). The only element Cornelio-Legarda challenges is that he knowingly possessed a firearm, an element common to both counts. This argument is based on his assertion the Government failed to introduce any evidence that he possessed a shotgun on April 27, 2007.

The indictment charged Cornelio-Legarda with committing Count 9 "on or about" April 26, 2007 and April 27, 2007, and committing Count 10 "on or about April 27, 2007." Cornelio-Legarda asserts evidence that he threatened Weeks's ex-boyfriend, DJ Littleshield, with a shotgun in April 2007 "should not have been admitted" and, thus, cannot support the two firearm convictions. Further, he claims the Government conceded during a sidebar that he did not possess the shotgun on August 27, 2007, the day it was seized from the bedroom he occupied in Weeks's residence. Thus, according to Cornelio-Legarda, there was no evidence presented from which a reasonable jury could conclude he possessed a firearm on April 27, 2007.

-15-

Cornelio-Legarda's first argument is wholly groundless.  During trial, he failed to object to the admissibility of the evidence detailing the incident involving Littleshield.  In fact, during the very sidebar he references in the second part of his argument, he represented to the district court that Weeks's testimony regarding the domestic dispute on April 27, 2007 was not necessary to prove the felon-in-possession charge because the Government "got" that charge with the story of the altercation involving Littleshield.  On appeal, he makes no colorable argument that Weeks's testimony describing the Littleshield incident was inadmissible or was insufficient to show he possessed a firearm during the altercation.

Cornelio-Legarda's second argument is equally meritless.  When an indictment charges a defendant with committing a crime "on or about" a specific date, the Government must simply provide evidence to establish the offense was committed "on a date reasonably near to the specified date alleged in the indictment." *United States v. Charley*, 189 F.3d 1251, 1273 (10th Cir. 1999) (quotation omitted).  The Government introduced evidence that Cornelio-Legarda threatened Littleshield with a shotgun in April 2007.  Weeks testified Cornelio-Legarda placed the shotgun in her vehicle immediately after the incident and called her "a day or two later" looking for the weapon.  Weeks then testified Cornelio-Legarda removed the gun from her vehicle that day and returned it by the following morning.  Relying on information obtained from the wiretap, Agent

Woodson testified the call from Cornelio-Legarda to Weeks was made on April 26, 2007, at 9:52 p.m. Thus, the Government clearly met its burden of proving Cornelio-Legarda possessed a firearm "on or about" April 27, 2007.

### C. Motion for Mistrial

Cornelio-Legarda's next argument centers around the organizational chart prepared by the Government and displayed to the jury as a demonstrative exhibit during Myhre's testimony. After the district court raised concerns about the exhibit *sua sponte* and requested the parties propose a limiting instruction to the jury, Cornelio-Legarda moved for a mistrial, arguing the prejudice created by the chart could not be cured by a limiting instruction. The district court denied the motion. Although we review the refusal to grant a mistrial for abuse of discretion, *United States v. Templeman*, 481 F.3d 1263, 1265 (10th Cir. 2007), the Government argues Cornelio-Legarda has waived any claim related to the display of the chart. We agree.

When the Government offered the chart into evidence, Cornelio-Legarda's codefendant objected on foundation grounds. Cornelio-Legarda also objected to the admission of the chart into evidence but suggested it could be used as a demonstrative exhibit. The district court adopted Cornelio-Legarda's suggestion and permitted the chart to be used for demonstrative purposes only. The court also gave the jury a cautionary instruction. The exhibit was thereafter used by both parties. Cornelio-Legarda used it extensively during Myhre's cross-

examination as a demonstrative aid to assist the jury in matching faces to the names of the individual coconspirators. He did not object to its use or move for a mistrial until the district court raised additional concerns *sua sponte* on the second day of trial. After denying the motion, the court gave the jury a comprehensive cautionary instruction. Cornelio-Legarda represented to the court that he had no objection to the instruction. The chart was never shown to the jury again.

On appeal, Cornelio-Legarda argues the display of the chart was unfairly prejudicial and warrants a new trial because the prejudice could not be cured by the district court's limiting instruction. Cornelio-Legarda has waived review of this issue under the invited error doctrine which "precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt." *United States v. Deberry*, 430 F.3d 1294, 1302 (10th Cir. 2005). Cornelio-Legarda cannot now complain about the use of the chart as a demonstrative exhibit during trial because he specifically suggested such a use to the district court. He thereafter repeatedly used the chart during his cross-examination of Myhre. Even assuming the district court committed error by permitting the parties to use the chart as a demonstrative exhibit, there is no doubt that error was invited by Cornelio-Legarda.

*D.*    *Admissibility of Coconspirator Statements*

Cornelio-Legarda next challenges the admission of out-of-court statements made by Garrick Murdock. The statements were admitted during the testimony of Stephanie Miller and relate to Count 18, the money laundering charge, and Count 2, the money laundering conspiracy charge. This court reviews the decision to admit coconspirator statements under Rule 801(d)(2)(E) for abuse of discretion. *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993). Cornelio-Legarda argues the district court erred by failing to hold a *James* hearing to vet Murdock's statements before permitting Miller's testimony. *See James*, 590 F.2d at 579-80.

Out-of-court statements made by coconspirators may be admitted as non-hearsay pursuant to Fed. R. Evid. 801(d)(2)(E) if the district court determines "(1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994) (quotation omitted). The district court's findings of fact are reviewed for clear error. *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996); *United States v. Gutierrez*, 48 F.3d 1134, 1137 (10th Cir. 1995). Before making a final ruling on the admissibility of such statements, a district court may proceed in one of two ways: (1) hold a *James* hearing outside the presence of the jury or (2) provisionally admit the evidence but require the Government to connect the statements to the

conspiracy during trial. *Urena*, 27 F.3d at 1490-91. Although a *James* hearing is the preferred approach, the district court retains discretion to follow the latter course. *Id*. at 1491. Here, the district court fully understood the applicable law and chose to provisionally admit the out-of-court statements, stating:

> I'm not going to take time to do a *James* hearing now. I'm going to allow the government to move forward, and we'll see if we can tie it up later. If not, I'll tell the jury to disregard it. It's not the preferred way to do it in the Tenth Circuit, but that's the way we're going to do it here.
> . . .
> I'll make the findings that I need to make at a more appropriate time, at a time not to inconvenience the jury . . . .

The court made the appropriate Rule 801(d)(2)(E) findings the day after Miller testified, concluding a preponderance of the evidence showed that a conspiracy to launder money existed; Cornelio-Legarda, Miller, and Murdock were all members of that conspiracy; and Murdock's out-of-court statements were made in furtherance of and during the course of that conspiracy. Having reviewed the record, we can discern no abuse of the court's discretion in deciding to hear the testimony before making its factual findings. Its approach was completely consistent with our precedent.

Cornelio-Legarda also appears to argue the district court's Rule 801(d)(2)(E) findings are clearly erroneous. Although his argument is convoluted and not well-developed, he seems to claim the out-of-court statements were not made in furtherance of the conspiracy to launder money internationally because

they related, at least in part, to domestic wire transfers. The statements at issue involve recorded telephone conversations detailing the wire transfer of $500 from the United States to Mexico in June 2007. The transcripts of the conversations were admitted as Exhibits 602-607. Cornelio-Legarda does not identify any statement in these exhibits or Miller's testimony regarding the exhibits that relates to domestic wire transfers. Our review of the record likewise does not uncover any such statements but does reveal that Cornelio-Legarda's argument is specious.[3]

Cornelio-Legarda makes a related, poorly developed argument that Miller's testimony and the exhibits relating to the June 2007 wire transfer were not "probative of a conspiracy charged in Count 2" because they related only to a "single attempted act" committed during a conspiracy that the indictment alleged spanned more than twenty months. This argument is wholly frivolous. Cornelio-Legarda cites no authority for the proposition the Government must prove that overt acts in furtherance of a conspiracy are consistently committed throughout the course of the conspiracy. The district court did not clearly err when it found Murdock's statements were made in the course of and in furtherance of the conspiracy.

---

[3]In his reply brief, Cornelio-Legarda represents that the out-of-court statements were "mostly about domestic Money Grams." Our review of the record confirms the falsity of this statement. Counsel is reminded of his duty to act with candor toward the court.

*E.    Impeachment Evidence*

Cornelio-Legarda's final challenge relates to his sentence. He alleges the Government withheld the presentence investigation report ("PSR") prepared for coconspirator Cha-Cha Ontiveros, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Pursuant to *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. To establish a *Brady* violation, Cornelio-Legarda must show the prosecution suppressed evidence that was (1) favorable to him and (2) material. *United States v. Smith*, 534 F.3d 1211, 1222 (10th Cir. 2008). This court reviews Cornelio-Legarda's *Brady* claim de novo. *Id.*

Cornelio-Legarda's argument is perfunctory. He alleges his offense level was increased by two points under USSG § 2D1.1(b)(1) based, in part, on statements Ontiveros made to Agent Woodson that Cornelio-Legarda traded a gun for drugs. Cornelio-Legarda believes Ontiveros's PSR contains a statement by Agent Woodson that Ontiveros is "a liar" and he argues he could have used the PSR to impeach Ontiveros's credibility. The Government correctly points out that Cornelio-Legarda cross-examined Agent Woodson about his view on Ontiveros's credibility during the sentencing proceeding. Agent Woodson admitted Ontiveros "was not 100 percent truthful" and he would not "base anything solely on [Ontiveros's] testimony." Evidence is material for *Brady*

-22-

purposes if it creates a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. *Id*. In light of Woodson's candid testimony during cross-examination, Cornelio-Legarda fails to show how the result of his sentencing proceeding would be different if the Government had provided him with Ontiveros's PSR. Thus, he has failed to show the PSR was material and *Brady* does not provide an avenue for relief from his sentence.

## IV.    Conclusion

We **affirm** the judgment and sentence.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge